UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PAUL K. OGDEN       *Plaintiff*, | ) ) ) | |
| *vs.* | ) ) | 1:08-cv-00369-JMS-DFH |
| CAROL CUTTER, in her official capacity as Commissioner, Indiana Department of Insurance, *et al.*,       *Defendants*. | ) ) ) ) ) | |

### **ORDER**

Presently before the Court are three fully briefed motions.[1]  The first is all Defendants' Motion for Summary Judgment.  [Dkt. 53.]  Next, Plaintiff, Mr. Ogden, challenges the admissibility of an affidavit that the Defendants filed in support of their Motion for Summary Judgment, through his Motion to Strike Affidavit of Brian Keith Beesley (the "Motion to Strike") [Dkt. 59].  Finally, Mr. Ogden has filed his own Motion for (partial) Summary Judgment.  [Dkt. 50.]

### MOTION TO STRIKE

As a preliminary matter, the Court notes Mr. Ogden's Motion to Strike, as well as the numerous evidentiary objections that the parties have lodged in their briefing papers.  Because the Court's resolution of the pending summary judgment motions does not depend on any material to which an evidentiary objection has been lodged, the Court will **DENY AS MOOT** all evidentiary objections, including the Motion to Strike.

---

[1] By consent of the parties, this case has been referred to this magistrate judge for all proceedings, including for the entry of judgment, as permitted under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  [Dkt. 20.]

## **FACTUAL BACKGROUND**

In November 2006, Mr. Ogden was hired as the co-manager of the newly created Title Insurance Division of the Indiana Department of Insurance (the "DOI"), though he would later become its sole manager. [Dkt. 52-3 at 7; 66-2 ¶3.] For state personnel purposes, that position is classified as a grade "EXBB" position. [Dkt. 66-4 at 6.] The parties dispute whether Mr. Ogden ever had a good relationship with Defendant Ms. Mihalik, who was his immediate supervisor and who headed the DOI's Consumer Protection Unit ("CPU"). [Dkt. 65 at 9.] (The Title Insurance Division was established within the CPU, and therefore ultimately under Ms. Mihalik's authority.) But no dispute exists that Mr. Ogden complained about her to Defendant Mr. Atterholt, who was until recently the DOI Commissioner—a position that Defendant Commissioner Cutter now holds. [*E.g.*, Dkt. 87-3 at 23.] (Commissioner Cutter is now a party only in her official capacity.) They parties agree that Mr. Ogden complained, among other things, about Ms. Mihalik's management style. [*Id.* at 24-25.] Mr. Ogden claims that he also complained about more serious matters: He recalls a conversation in the summer of 2007 where he claimed to Mr. Atterholt that Ms. Mihalik was misappropriating funds statutorily dedicated to the Title Insurance Division for general CPU purposes. [Dkt. 86-2 at 19.]

On September 12, 2007, Ms. Mihalik issued Mr. Ogden a "counseling memo," which she told him would be kept in a "fact file" rather than in his formal "personnel file" and would justify disciplinary measures if the advice it contained were not followed. [Dkt. 54-2 at 14.] Among her reminders was one that Mr. Ogden should adhere to the proper chain of command: He should have her sign off on enforcement activities that the Title Insurance Division initiated, and he should not disseminate draft title insurance bulletins to the industry that she and the Commissioner had not approved. [*See id.*]

Two days later, Mr. Ogden met with representatives from the Indiana State Personnel Department to complain about Ms. Mihalik and, according to an undisputed assertion in Mr. Ogden's Local Rule 56.1 statement, he complained about her "erratic behavior, her wild mood swings and retaliation against employees who crossed her or who 'did not have her back.'" [Dkt. 65 at 15, ¶25.] He also claims to have complained about what he believed were misappropriations of the Title Insurance Enforcement Fund ("TIEF"), about which he had previously complained to Mr. Atterholt, [Dkt. 86-3 at 13], though that was not the focus of his meeting with State Personnel as he thought that it was outside their area of expertise [*id.* at 14].

On September 17, Mr. Ogden drafted two documents in response to the counseling memo that he had received from Ms. Mihalik. One was a response to her, where he bristled at the suggestion that he channel communications through her, rather than advising Mr. Atterholt directly, about "a title insurance issue I know a lot about, and you do not." [Dkt. 54-2 at 15.] And regarding title insurance bulletins, he accused her of falsely stating that the Commissioner had no interest in circulating any. [*Id.*] He noted that her micromanagement of the Title Insurance Division had caused the mission of the division to be "completely derailed." [*Id.*] He concluded by advising that he had, "in conjunction" with his memo, "filed a formal request to the Commissioner that the Title Insurance Division be removed from [her] supervision." [*Id.*]

That formal request to then Commissioner Atterholt also dated September 17 included thirty-five reasons why he believed that "Ms. Mihalik not only will never be an asset to the Division's mission of regulating the title insurance industry, but…she will often actively undermine that mission." [Dkt. 54-2 at 1.] There, he chronicled his view of her failings, including questioning her honesty, her "gross deficiencies" in legal matters, and her managerial abilities. [*Id.* at 1-5.] He also repeated his allegations about the misappropriation of TIEF funds

for unauthorized purposes, for example "[t]hat Ms. Mihalik used money intended by the legislature to fund the Title Insurance Division to pay the salary of a secretary who was hired to work in the Title Division, but for six months has…not been permitted to do any work for the Title Insurance Division. Dedicated funds have likewise been improperly used to pay other employee salaries in the CPU." [*Id.* at 3.] All told, four of his thirty-five points were directed toward allegations of misappropriation of the TIEF; two other points raised allegations about falsifying regulatory data and violations of state personnel rules. [*See id.*]

A few hours after Mr. Ogden left his thirty-five point memo for Mr. Atterholt, the DOI's counsel came to Mr. Ogden's office and advised him that he was needed for a predeprivation meeting. [Dkt. 52-6 ¶¶ 9-10]. According to Mr. Ogden, the DOI's counsel informed him that the hearing would be a mere formality; Mr. Ogden would be terminated if he did not voluntarily resign. [*Id.* at ¶10.] At the predeprivation meeting, Mr. Ogden was presented with two letters: one a voluntary and immediate resignation letter; the other, an immediate termination letter. [*Id.* ¶12.] The DOI's counsel told Mr. Ogden that he was "out of line," but according to Mr. Ogden, provided no further explanation or evidence. [*Id.* at ¶13.] Mr. Ogden asked for two weeks to look for another job, whereupon Mr. Atterholt turned toward Ms. Mihalik who shook her head "no." [*Id.* at ¶18.] Mr. Ogden signed the voluntary resignation letter to avoid losing his accrued vacation time and to avoid being placed on the State's "do not hire" list. [*Id.* ¶¶ 18-19.]

Following the meeting, Mr. Ogden was escorted back to his office to gather his belongings and was then escorted to the elevator. [*Id.* at ¶¶25, 28.] Mr. Ogden's government issued computer had been reclaimed at some point during the predeprivation meeting. [*Id.* at ¶26.]

Mr. Ogden originally filed suit in state court, presenting nine counts relating to his forced resignation. Because some of those counts arose under federal law, including 42 U.S.C. § 1983, Defendants removed the case to this Court asserting federal question jurisdiction. [Dkt. 1.]

## SUMMARY JUDGMENT STANDARD

The parties have each filed motions for summary judgment. In other words, each party asks the Court to decide that a trial is unnecessary because it could only come out one way—in that party's favor. Accordingly, before granting a motion for summary judgment, the Court must find that there is no dispute over the material facts and, based only upon those undisputed material facts, that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Evidence that would be inadmissible at trial can neither support nor refute a motion for summary judgment. *Id.* 56(e)(1).

When deciding whether to grant a motion for summary judgment, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial...against the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The filing of cross-motions of summary judgment on an issue does not automatically mean that no genuine issue of fact exists. *R. J. Corman Derailment Servs., L.L.C. v. Int'l Union*, 335 F.3d 643, 647-648 (7th Cir. 2003).

## ANALYSIS

### A. Mr. Ogden's Federal Claims

#### 1. Count VII:  Mr. Ogden's § 1983 Claim

In Count VII, Mr. Ogden alleges that Mr. Atterholt and Ms. Mihalik are liable to him under 42 U.S.C. § 1983. That statute provides a cause of action for deprivations of federal constitutional rights. *Id*. Although there are other requirements, the only requirement that Defendants challenge in their Motion for Summary Judgment with respect to Count VII is Mr.

Ogden's ability to show any violation of the U.S. Constitution.  Mr. Ogden claims that Mr. Atterholt and Ms. Mihalik violated two sets of his rights:  his First Amendment right to free speech and his Fourteenth Amendment right to procedural due process.

### a. First Amendment Right to Freedom of Speech

To prove his First Amendment Free Speech rights were violated, Mr. Ogden must show that he engaged in constitutionally protected speech that motivated Mr. Atterholt's decision to fire him. *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 2009 U.S. App. LEXIS 16082, *11 (7th Cir. 2009).  If he can prove that, the burden then shifts to the Defendants to prove that Mr. Ogden would have been fired for other, permissible, reasons, irrespective of his protected speech. *Id.*

The ultimately dispositive issue for present purposes is whether Mr. Ogden's speech was constitutionally protected, which is an inquiry that involves a pure question of law, *Houskins v. Sheahan*, 549 F. 3d 480, 489 (7th Cir. 2008).  The First Amendment protects both public employees and ordinary citizens; however, its protections for the former are more limited than those for the latter. *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) ("When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom.  Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." (citations omitted)); *Connick v. Myers*, 461 U.S. 138, 149 (1983)("[T]he First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.").

While a public employee, Mr. Ogden's speech was protected if three conditions are satisfied:  (1) He made the speech as a "citizen" rather than as an "employee;" (2) the speech related to a matter of "public" concern; and (3) his interest in speaking outweighs "the

government's interest in promoting effective and efficient public services."  *Clarke*, 2009 U.S. App. LEXIS 16082 at \*\*13-14 (citing, among others, *Garcetti*, 547 U.S. 410).

The Defendants have argued that under *Garcetti*, Mr. Ogden's speech was made as an "employee"—not as a "citizen"—and thus cannot qualify for First Amendment protection.  In *Garcetti*, the Supreme Court held public employees speak as employees when making statements "pursuant to their official duties" or that otherwise "owe[] [their] existence to [the] public employee[s'] professional responsibilities."  547 U.S. at 421-22.  Because the deputy prosecutor in that case was expected to advise his supervisor about the proper disposition of pending cases, he was speaking as an employee when he complained to his superiors that a search warrant appeared to contain material misrepresentations and when he suggested that the resulting criminal case be dismissed.  *Id.* at 414, 422.  The deputy prosecutor's speech was part of what "he was paid to [do]," and, if his supervisors were dissatisfied with it, they were entitled to discipline him.  *Id.* at 422.

In response, Mr. Ogden asserts, almost perfunctorily, that he was speaking as a citizen for *Garcetti* purposes.[2]  The Court disagrees.

Regarding his statements about the misappropriation of the TEIF for general CPU expenses, Mr. Ogden claims that those statements do not relate to any specific job duties that he had.  For that proposition, he cites Ms. Mihalik's deposition testimony that Mr. Ogden's reporting illegal conduct was not part of his "specific job description."  [Dkt. 65 at  29 (citing

---

[2]  Defendants surveyed many of those cases decided by the Seventh Circuit in their opening brief's five-and-a-half page argument about how *Garcetti* precludes Mr. Ogden's First Amendment claim.  [Dkt. 54 at 20-25.]  Mr. Ogden, however, devotes only half of a page to *Garcetti*.  And he does not cite—much less try to analogize—a single case finding that the plaintiff spoke as a "citizen" for *Garcetti* purposes.  [*See* Dkt. 65 at 29-30.]  Given the wealth of authority interpreting *Garcetti* (almost 1,000 judicial citations according to both Shepard's and Keycite), the lack of authority supporting Mr. Ogden's proposed application of *Garcetti* signals that his argument starts out on a very weak foot.

Dkt. 66-8 at 3).] But he ignores the Supreme Court's command that courts take a "practical" view of job functions rather than one beholden to formal job descriptions, *Garcetti*, 547 U.S. at 424, and Seventh Circuit cases holding that reports of possible misconduct to superiors constitute "employee" speech, *see Spiegla v. Hull*, 481 F.3d 961, 967 (7th Cir. 2007), especially by managerial employees like Mr. Ogden, *see Tamayo v. Blagojevich*, 526 F.3d 1074, 1092 (7th Cir. 2008) ("Reporting alleged misconduct against an agency over which one has general supervisory responsibility is part of the duties of such an office." (citation omitted)). [*See also* Dkt. 66-7 at 3 (Mr. Atterholt's assistant's email to Mr. Ogden explaining that she thought that he had an "obligation" to inform Mr. Atterholt of the alleged misappropriations).][3] To the extent that he claims that his statements about TIEF were not part of his job responsibilities because he lacked the ability to directly monitor expenditures from the fund [Dkt. 65 at 29], he ignores that, at the time, he thought that his position entitled him to do just that, [Dkt. 66-11 at 13 (complaining that Ms. Mihalik did not let him "monitor the money going into the fund and make decisions regarding expenditures," as she was supposed to do)]. Thus, the Court finds that his TIEF statements were made as an employee and not subject to First Amendment protections.

For all non-TIEF statements, Mr. Ogden simply says that they were "not even arguably related" to his duties, without developing any argument or citing any authority. [Dkt. 65 at 29.] That is not a cogent response to the Defendants' (compelling) argument that those statements

---

[3] Additionally, Indiana taxpayers would—rightly—be stunned if the Court took seriously Mr. Ogden's claim that when a high level attorney for the DOI like himself warned his client about what he thought were illegal practices, he was not doing what "he was paid to [do]," *Garcetti*, 547 U.S. at 422. And even if it were actually outside his job responsibilities, he may have been professionally obligated to speak up anyway. *Cf.* Ind. R. Prof. Cond. 2.1 cmt. 5 ("[W]hen a lawyer knows that a client proposes a course of action that is likely to result in substantial adverse legal consequences to the client, the lawyer's duty to the client under Rule 1.4 may require that the lawyer offer advice if the client's course of action is related to the representation.").

were part of his job responsibilities. The Court will not do Mr. Ogden's work for him. *United States v. Giovannetti*, 919 F.2d 1223, 1230 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is a good point despite a lack of supporting authority or in the face of contrary authority, forfeits the point." (emphasis and citations omitted)). Thus, the Court finds that those statements too were made as an "employee."

In sum, the Court finds that even if Mr. Ogden were terminated for his speech, it was speech made as an employee and not as a citizen. Therefore, the Court need not consider whether the speech was a matter of public concern and, if it is, to balance the competing interests. *See Davis v. Cook County*, 534 F.3d 650, 653 (7th Cir. 2008) ("[T]he question whether speech is about a matter of public concern does not come into play unless the court first finds that the speech was made as a citizen rather than as an employee doing her job."). Defendants are entitled to summary judgment on Mr. Ogden's First Amendment claim.

### b. Guarantee of Procedural Due Process

To prove a procedural Due Process violation, Mr. Ogden "must show that the State deprived him of a protected liberty or property interest and that the deprivation occurred without adequate due process." *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 926 (7th Cir. 2007) (citation omitted). Of those two types of deprivations, a loss of public employment potentially implicates only a property deprivation where, as here, the employee does not claim to be blacklisted from future employment. *See Williams v. Seniff*, 342 F.3d 774, 787 (7th Cir. 2003). Before a public employee can claim a property interest in continued employment, however, some "independent source such as state law" must provide the employee with a "legitimate claim or entitlement to it;" the Constitution does not create property interests. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). But if a property interest exists, the Constitution—not state law—determines the

minimum procedures that the state must follow before it can deprive a person of that interest. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).

### 1. Did Mr. Ogden have a "property interest" to trigger due process?

Determining whether Mr. Ogden had a property interest in his continued employment, requires deciding whether Mr. Ogden's employment was at will—and Indiana law has a "strong" presumption that he, like all employees, had at-will employment, *Orr v. Westminster Village North, Inc.*, 689 N.E.2d 712, 717 (Ind. 1997). If he did, both he and his employer could "terminate the employment at any time for a good reason, bad reason, or no reason at all," *Montgomery v. Bd. of Trs. of Purdue Univ.*, 849 N.E.2d 1120, 1128 (Ind. 2006) (citations and quotation omitted). Such employer discretion to terminate employment is incompatible with any entitlement to continued employment, the bedrock of "property" for Fourteenth Amendment purposes. *See, e.g.*, *Rujawitz v. Martin*, 561 F.3d 685, 688-89 (7th Cir. 2009) (finding no property interest where employee failed to introduce evidence to overcome legal presumption of at-will employment). A protectable property interest only arises once the State limits that discretion with "some substantive criteria…[,] as can be found, for example, in a requirement that employees be fired only 'for cause.'" *Cain v. Larson*, 879 F.2d 1424, 1426 (7th Cir. 1989) (footnote omitted). Only then must a deprivation of employment comport with due process. *Gilbert v. Homar*, 520 U.S. 924, 928-29 (1997).

Although the Indiana General Assembly has required by statute that certain state employees be discharged only for cause, so-called "merit employees," Ind. Code § 4-15-2-34,[4] Mr. Ogden does not claim that he was one of those employees. Rather, he claims due process rights under Indiana's Executive Order 05-14. That Executive Order applies only to non-merit

---

[4] *See also Daniels v. Hutson*, 489 N.E.2d 107, 111 (Ind. Ct. App. 1986) (noting that for merit employees, "dismissals and demotions [must] be made only for cause").

employees who meet four criteria. Of those, the parties agree that Mr. Ogden met three. As to the remaining, disputed criterion—which is whether Mr. Ogden's job "was classified in the ESM or SAM/PAT job categories," *id.* at § 1(a)(iii)—the parties have submitted conflicting evidence. [*Compare* Dkt. 54-7 ¶5 (stating that "EXBB" is merely a sub-category of the "ESM" category), *with* Dkt. 66-5 at 4 (apparently listing "EXBB" as a separate job category).] (It was the Defendants' evidence on this point that was at issue in the Motion to Strike.)

A factual dispute about the applicability of Executive Order 05-14 to Mr. Ogden would only be a material one for summary judgment purposes if, assuming that it applied, the Executive Order gave Mr. Ogden a Fourteenth Amendment property interest in his employment. It did not do so.

The Executive Order permits covered employees to "file a complaint concerning [their] dismissal, demotion, or suspension…with the State Employees Appeals Commission within thirty (30) calendar days [of the adverse action]….The State Employees Appeals Commission will determine whether…[that adverse action] was based on inadequate performance or inappropriate behavior…subject to judicial review in accordance with the Administrative Orders and Procedures Act." Ind. Ex. Order 05-14 §1.[5] The personnel manual implementing that Executive Order further provides that a covered employee "should" only be disciplined following a "full and fair investigation" and "should," before any disciplinary action is imposed, be afforded (1) notice, (2) a brief summary of the evidence supporting the action, and (3) an opportunity to respond. [Dkt. 52-8 at 5, 10.]

---

[5] The State Employees Appeals Commission ("SEAC") ordinarily "hear[s] [and] investigate[s]" appeals by merit-employees about adverse job actions and will "fairly and impartially render decisions as to the validity of the appeals or lack thereof." Ind. Code. § 4-15-1.5-6(1).

Regarding the dispositive question for the present due process claim, the Defendants say that Mr. Ogden had no property interest in his employment because the Executive Order placed no substantive limits on the DOI's termination ability. [Dkt. 54 at 31; 58 at 6.] Rather, it merely provided a procedural mechanism for employee discipline, without altering the at-will nature of non-merit employment. [*Id.*]

Mr. Ogden has no response to the argument that he lacked a property interest in his employment (indeed he never mentions the concept of "property")—even though the Defendants make that argument both in their brief supporting their motion for summary judgment and in their brief opposing his.[6] And there do not appear to be any. If the Governor had intended to provide covered non-merit employees with all the job security that the General Assembly has guaranteed merit employees—and thereby give them property interests for federal due process purposes—the Executive Order would have explicitly provided, for example, that covered employees would only be terminated "for cause." The Governor did not do that. Instead, the Executive Order guarantees only a SEAC review that will determine whether an employee has been terminated for inadequate performance or inappropriate behavior. But it does not guarantee that an employee will be reinstated if either metric is satisfied. *See* Ind. Ex. Order 05-14 § 1(c) (providing only that SEAC "will determine whether the suspension, demotion, or dismissal was based on inadequate performance or inappropriate behavior"). Given Indiana's "strong"

---

[6] The Court "is entitled to assume that, if [he] had viable arguments…, [he] would have presented them." *Brownstone Publ'g, LLC v. AT&T, Inc.*, 2009 U.S. Dist. LEXIS 25485, *7 (S.D. Ind. 2009) (quotation omitted). Mr. Ogden is aware of this principle: He invoked it in his reply brief. [Dk. 61 at 1 (suggesting that because he had argued that his pre-deprivation hearing did not comport with the requirements set forth in the personnel manual and because the Defendants did not respond to that argument, the Court should consider the Defendants to have "waived" any argument about the adequacy of the pre-deprivation hearing).]

presumption that all employment is at-will, *Orr*, 689 N.E.2d at 717, the failure to make that latter guarantee leaves SEAC with discretion to order reinstatement, or not.

That discretion falls far short of the rigors imposed by "for cause" discipline. For example, SEAC might exercise its discretion to deny reinstatement to a discharged employee who was competent, efficient, and compliant with all work rules but, as a high-ranking employee (as Mr. Ogden was), caused the administration political embarrassment from his off-duty escapades. *Cf. Holmes v. Review Bd.*, 451 N.E.2d 83, 87 (Ind. Ct. App. 1983) (holding that employee fired after being charged with three felony counts that were later dismissed was not fired for "just cause" and was therefore entitled to unemployment benefits).[7] Nor would it necessarily require the reinstatement of a worker who, although objectively a good one, was deemed inadequate because she was not the "best" worker that the DOI thought the marketplace could provide. Not surprisingly, the only other (albeit unreported) case that the Court has located interpreting the Executive Order concluded that it does not affect the employee's "at-will" status and thus does not create a due process property interest. *O'Shell v. Ind. State Employees' Appeals Com'n*, 2009 WL 1686704, \*2 (unpublished table opinion) (Ind. Ct. App. 2009).

What Mr. Ogden does argue is that because the personnel manual provides standards for a predeprivation hearing, a failure to follow those procedures constitutes a due process violation. [*See* Dkt. 65 at 23-24.] But that argument cannot carry the day. As an initial matter, the ability of even unambiguous, mandatory language in a personnel handbook to modify the employment

---

[7] *Cf. also Hughey v. Review Bd.*, 639 N.E.2d 1044, 1046 (Ind. Ct. App. 1994) (holding termination for off-duty battery conviction without accompanying jail term was not termination for "just cause"); *Conseco, Inc. v. Review Bd.*, 626 N.E.2d 559, 563 (Ind. Ct. App. 1993) (holding termination for off-duty shoplifting was not termination for "just cause"); *Best Lock Corp. v. Review Bd.*, 572 N.E.2d 520, 527 (Ind. Ct. App. 1991) (holding that termination for off-duty alcohol consumption was not termination for "just cause").

at-will doctrine in the absence of consideration is a dubious proposition (absent a claim of promissory estoppel, which is not raised here). *See Orr*, 689 N.E.2d at 718-20; *Hayes v. Trs. of Ind. Univ.*, 902 N.E.2d 303, 312 (Ind. Ct. App. 2009). That claim is even more dubious given the personnel manual's use of the permissive "should" rather than the mandatory "shall" or "must" in all but one of the provisions that Mr. Ogden cites. *See Moss v. Martin*, 473 F.3d 694, 701 (7th Cir. 2007) (holding that permissive "may" did not create a property right). Yet even if the manual did explicitly promise him a better predeprivation hearing than what Mr. Ogden received, that promise is irrelevant to determining whether he actually had a property interest in continued employment. *Rujawitz*, 561 F.3d at 688 ("Procedural guarantees, whether relied on or not, do not establish a property interest protected under the Fourteenth Amendment's Due Process Clause." (citation omitted)); *Moulton v. Vigo County*, 150 F.3d 801, 805 (7th Cir. 1998) ("Moulton's entitlement to a hearing may bear on whether he received due process, but it is not relevant to determining whether he had a property interest in continued employment.").

Because Mr. Ogden has not overcome the strong presumption that he was an at-will employee, he had no property interest that could form the basis for a due process violation. Therefore, the Court must enter summary judgment in Defendants' favor on Mr. Ogden's due process claim.

### 2. Was the process available to Mr. Ogden adequate?

Regardless as to whether Mr. Ogden had a property interest in his employment and regardless as to whether the predeprivation hearing that deprived him of that interest was, as Mr. Ogden claims, a sham because the termination decision had already been made, the Court would still have to grant the Defendants summary judgment on this claim.

Where, as here, the alleged improper property deprivation arises through a disregard (whether negligently or intentionally) of otherwise valid predeprivation procedures, the "deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (dismissing § 1983 claim against a prison guard alleged to have intentionally destroyed an inmate's property without a hearing).

The Governor, through his Executive Order, provided just such a postdeprivation procedure for Mr. Ogden to argue that he should not have been terminated: an appeal to SEAC within thirty days of his termination (with further judicial review of SEAC's decision through the Administrative Orders and Procedures Act, Ind. Code §§ 4-21.5-1 *et seq.*). Ind. Ex. Order 05-14 §1. Mr. Ogden chose not to take advantage of that procedure because, although it could reinstate him, SEAC could not award him attorney's fees if prevailed. [Dkt. 61 at 10.] A postdeprivation procedure can, however, be meaningful even without "all the relief which may have been available…under § 1983." *Parratt v. Taylor*, 451 U.S. 527, 544 (1981) (holding postdeprivation procedure meaningful even though it lacked a jury trial right and did not allow for punitive damages).

According to the Seventh Circuit, a meaningful postdeprivation procedure is one that is not "meaningless or nonexistent." *Easter House v. Felder*, 910 F.2d 1387, 1405 (7th Cir. 1990). SEAC's inability to award attorney's fees does not render the other relief that it can provide meaningless or nonexistent. *Gable v. City of Chicago*, 296 F.3d 531, 540 (7th Cir. 2002)

(rejecting claim that postdeprivation procedure was inadequate if it could not provide attorney's fees). The SEAC appeal procedure was adequate, yet Mr.Ogden failed to avail himself of it.[8]

Like Mr. Ogden's First Amendment claim, his procedural due process claim fails as a matter of law. Having failed to identify a constitutional violation, it is impossible for him to prevail on his § 1983 claim. The Court will, therefore, enter summary judgment against him on Count VII.

### 2. Count VIII: Due Process Claim

In Count VIII, the one on which Mr. Ogden his filed his own motion for summary judgment, Mr. Ogden claims that his predeprivation hearing did not comply with procedural due process. Mr. Ogden has cited no authority for the proposition that he can maintain a due process claim outside the context of a § 1983 action. But to the extent that any such authority even exists, the Court has already determined that no due process violation occurred. Mr. Ogden had no "property" interest to trigger the Constitution's due process guarantees all. *See* U.S. Const. Amend. XIV, § 1 ("[No] … state [shall] deprive any person of life, liberty, or property, without due process of law…."). And even if he had a property interest, his failure to take advantage of the postdeprivation procedures that Indiana has made available to him preclude any recovery. The Court will, therefore, deny Mr. Ogden's Motion for Summary Judgment and, on this count, grant Defendants' Motion for Summary judgment.

---

[8] Mr. Ogden is correct insofar as he argues that he is technically not required to exhaust state-law remedies before filing a § 1983 suit. But, as the Seventh Circuit has noted, "this does not change the fact that no due process violation has occurred when adequate state remedies exist." *Veterans Legal Def. Fund v. Schwartz*, 330 F.3d 937, 941 (7th Cir. 2003). That is because a procedural due process challenge tests only the adequacy of the procedures that the state provides. "Therefore, we do not require a plaintiff to pursue those remedies in order to challenge their adequacy, but likewise we do not allow a plaintiff to claim that [he] was denied due process just because [he] chose not to pursue remedies that were adequate." *Id.*

### 3. Other Federal Claims

To the extent that any of Mr. Ogden's other counts can be read to allege violations of Mr. Ogden's federal constitutional rights, [*see* Count II (claiming that Indiana state law protects employees from exercising federal constitutional rights), Count V (claiming that Indiana law protects employees from speaking out on issues of public concern)] those counts fail for the same reasons discussed above.

### B. Mr. Ogden's State Claims

Where, as here, all federal claims in a case are dismissed (and no other basis for original jurisdiction exists), "the presumption is that the district judge will relinquish jurisdiction over any supplemental claim to the state courts." *Leister v. Dovetail, Inc.*, 546 F.3d 875, 882 (7th Cir. 2008). While considerations of "judicial economy, convenience, fairness and comity" can overcome that presumption, they have not done so in this case. Any efficiencies obtained by consideration of the state law claims would be minimal: The parties have fully completed discovery and have fully briefed a motion for summary judgment on the state law issues. The Court is confident that they can, with very little effort, revise those briefs in short order and resubmit them. On the other hand, principles of comity are particularly compelling here, where the remaining issues concern application of state statutory and regulatory law affecting state employee conduct and discipline. *See generally Bishop v. Wood,* 426 U.S. 341, 350 (1976) ("[A] federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies."); *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (explaining that federal courts are not designed "to act as a super personnel department" (quotation omitted)). Indiana state courts, at both the trial and appellate levels, are far better suited to decide these state law issues. Accordingly, the Court will remand all state law claims back to the Marion Superior Court, where Mr. Ogden originally filed this action.

## CONCLUSION

The Court **DENIES** Plaintiff's Motion for Summary judgment and **DENIES AS MOOT** Plaintiff's Motion to Strike.

The Court **GRANTS IN PART** Defendants' Motion for Summary Judgment. Summary judgment will issue in favor of Defendants on Counts VII and VIII and, only to the extent that any other Counts allege violations of federal constitutional law, on those other Counts as well.

The remaining state law claims are **REMANDED** back to the Marion Superior Court.

08/04/2009

                                         Jane Magnus-Stinson
                                         United States Magistrate Judge
                                         Southern District of Indiana

**Distribution via ECF:**

David A. Arthur
INDIANA OFFICE OF THE ATTORNEY GENERAL
David.Arthur@atg.in.gov

Eric James Beaver
INDIANA OFFICE OF THE ATTORNEY GENERAL
eric.beaver@atg.in.gov

Adam Lenkowsky
ROBERTS & BISHOP
alenkowsky@roberts-bishop.com

Kenneth T. Roberts
ROBERTS & BISHOP
ktrobatty@aol.com

Tasha Rebecca Roberts
ROBERTS AND BISHOP
troberts@roberts-bishop.com